**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————— :
                                 :
KEARA NIEVES and TEDDY         :
SOLOMON, *on behalf of themselves*  :
*and all others similarly situated*,     :
                                   :
                 Plaintiffs,   :     Civil Action No. 17-6146 (FLW) (DEA)
                                   :
        v.                   :
                                   :           **OPINION**
LYFT, INC.,                   :
                                   :
                 Defendant.  :
———————————————————— :

**<u>WOLFSON, United States District Judge</u>:**

In this putative class action, Plaintiffs Keara Nieves and Teddy Solomon[1] (collectively,

"Plaintiffs") assert claims against Defendant Lyft, Inc. ("Defendant" or "Lyft") for breach of

contract, breach of the implied covenant of good faith and fair dealing, fraud, and unjust

enrichment, which claims relate to the way that Lyft calculates compensation for participant-

drivers in Lyft's ridesharing service.  Presently before the Court is:  (i) Defendant's Motion to

Dismiss Nieves' Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),

for lack of standing and failure to state a claim upon which relief can be granted; and (ii)

Plaintiffs' Cross-Motion for Leave to File its proposed First Amended Class Action Complaint.

For the reasons that follow, Defendant's Motion to Dismiss for failure to state a claim is granted,

and Plaintiffs' Cross-Motion for Leave to File its proposed First Amended Class Action

_____

[1] While Nieves is the sole named Plaintiff in the original Complaint, Plaintiffs have moved for
leave to file a proposed First Amended Class Action Complaint (the "FAC"), which seeks to add
Solomon as a Plaintiff.  As explained, *infra*, the Court will consider the FAC for the purposes of
the instant Motions, and thus, will refer to Nieves and Solomon, collectively, as "Plaintiffs."

1

Complaint is denied. However, Plaintiff is given leave to file an amended complaint consistent with this Opinion.

## I.     FACTUAL BACKGROUND[2]

### A.     Lyft's Ridesharing Platform

Through its mobile phone application (the "Lyft App"), website, and technology platform (collectively, the "Lyft Platform"), Lyft provides a mobile-based ridesharing service that connects persons seeking ground transportation to certain destinations ("Riders") with persons driving to or through those destinations ("Drivers"). First Amended Class Action Complaint ("FAC"), ¶¶ 1-2, 13-15. To obtain a ride, Riders open the Lyft App, request a ride from one location to another, and are matched with an available Driver. *Id.* at ¶ 14. At the end of the ride, Lyft receives an electronic payment from the Rider through the Lyft App, a portion of which is then paid to the Driver. *Id.* at ¶¶ 2, 14.

### B.     Lyft's Terms of Service

Lyft's relationship with its Riders and Drivers is governed by Lyft's Terms of Service ("TOS") agreement. *Id.* at ¶ 3; Lyft Terms of Service ("TOS"), FAC, Ex. A at Preamble. The preamble to that document states that the TOS "constitute[s] a binding agreement" between Lyft and its Riders and Drivers. TOS at Preamble. The TOS further provides: "By entering into this

---

[2] For the purposes of the instant Motions, the Court will take as true the facts alleged in the FAC, drawing all inferences in favor of Plaintiffs, the non-moving parties. *See Advanced Orthopedics & Sports Med. v. Blue Cross Blue Shield of Massachusetts*, No. 14-7280, 2015 WL 4430488, at *1 (D.N.J. July 20, 2015) (drawing facts from a proposed amended complaint in analyzing a motion to dismiss); *Warner v. Twp. of S. Harrison*, No. 09-6095, 2010 WL 3001969, at *8 (D.N.J. July 26, 2010) (drawing facts from the plaintiff's proposed amended complaint for the purposes of deciding a motion to dismiss and cross-motion for leave to amend the complaint); *see also Newman v. Beard*, 617 F.3d 775, 779 (3d Cir. 2010) (observing that, on a motion to dismiss, the court must "accept all factual allegations as true, construe the . . . complaint in the light most favorable to [the plaintiff], and determine whether, under any reasonable reading of the amended complaint, he may be entitled to relief.").

Agreement, you expressly acknowledge that you understand this Agreement . . . and accept all of its terms.  IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT, YOU MAY NOT USE OR ACCESS THE LYFT PLATFORM." *Id.*

Section 4 of the TOS provides that each Rider agrees to pay charged amounts ("Charges") for the services (the "Services") provided by Drivers to Riders through the Lyft Platform.  *Id.* at § 4.  Charges consist of fares and "other applicable fees, tolls, surcharges, and taxes as set forth on your market's Lyft Cities page (www.lyft.com/cities), plus any tips to the Driver that you elect to pay."  *Id.*  With respect to the fares charged to Riders (the "Fares"), § 4 of the TOS provides as follows:

Fares.  There are two types of fares, variable and quoted.

- **Variable Fares**.  Variable fares consist of a base charge and incremental charges based on the duration and distance of your ride.  For particularly short rides, minimum fares may apply.  Please note that we use GPS data from your Driver's phone to calculate the distance traveled on your ride.  We cannot guarantee the availability or accuracy of GPS data.  If we lose signal we will calculate time and distance using available data from your ride.

- **Quoted Fares**.  In some cases Lyft may quote you a Fare at the time of your request.  The quote is subject to change until the Ride request is confirmed.  If during your ride you change your destination, make multiple stops, or attempt to abuse the Lyft Platform, we may cancel the fare quote and charge you a variable fare based on the time and distance of your ride.  Lyft does not guarantee that the quoted fare price will be equal to a variable fare for the same ride.

*Id.*  Section 4 then provides that "Fares may be subject to a multiplier at times of high demand of the Services ("Prime Time") as determined by Lyft."  *Id.*  Section 4 also sets forth other fees and charges, including cancellation fees, damage fees, tolls, other charges, and a variable per-ride service fee (the "Service Fee") to support the Lyft Platform and related services provided to the Rider by Lyft, which Service Fee "shall be retained by Lyft in its entirety."  *Id.*  Finally, § 4

provides that a Rider may elect to tip his or her Driver in cash or through the Lyft App, and that "[a]ny tips will be provided entirely to the applicable Driver." *Id.*

Section 5 of the TOS, entitled "Payments," sets forth the method by which Lyft pays its Drivers. *See id.* at § 5. Specifically, § 5 of the TOS provides, in relevant part:

> If you are a Driver, you will receive payment for your provision of Services. All Fare payments are subject to a Lyft Commission, discussed below. You will also receive any tips provided by Riders to you, and tips will not be subject to any Lyft Commission. Lyft will process all payments due to you through its third party payments processor. You acknowledge and agree that such amounts shall not include any interest and will be net of any amounts that we are required to withhold by law.
>
> - **Commission**. In exchange for permitting you to offer your Services through the Lyft Platform and marketplace as a Driver, you agree to pay Lyft (and permit Lyft to retain) a fee based on each transaction in which you provide Services (the "Commission"). The amount of the applicable Commission will be communicated to you in a Commission schedule through the Driver portal. Lyft reserves the right to change the Commission at any time in Lyft's discretion based upon local market factors, and Lyft will provide you with notice in the event of such change. Continued use of the Lyft Platform after any such change in the Commission calculation shall constitute your consent to such change.
>
> - **Pricing**. You expressly authorize Lyft to set the prices on your behalf for all Charges that apply to the provision of Services. Lyft reserves the right to change the Fare schedule at any time in our discretion based upon local market factors, and we will provide you with notice in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the applicable Fares. Charges may be subject to maximum limits as set forth in your market's Lyft Cities page or the Lyft Help Center.

*Id.*

### C. The FAC

The FAC asserts various contract, quasi-contract, and fraud-based claims relating to the way Lyft pays its Drivers, including Plaintiffs. Because those claims stem from Plaintiffs' understanding of Lyft's contractual obligations to its Drivers, the Court will set forth the allegations pertaining to how Plaintiffs allegedly arrived at that understanding prior to agreeing to the TOS.

### 1. *Plaintiff Keara Nieves*

According to the FAC, Plaintiff Keara Nieves, a resident of Long Branch, New Jersey, has been a Lyft Driver since 2016. FAC ¶ 6. Nieves alleges that after downloading the Lyft App to her mobile phone, she then followed several instructional prompts to register as a Driver with Lyft. *Id.* at ¶ 17. Relevant to the instant dispute, Lyft's sign-up page included a hyperlink to the TOS. *Id.* at ¶ 18. Nieves alleges that, upon accessing that hyperlink, she read the "Charges" section of the TOS, including the provision explaining that Charges consist of fares and "'other applicable fees, tolls, surcharges, and taxes as set forth on your market's Lyft Cities page (www.lyft.com/cities), plus any tips to the Driver that you elect to pay.'" *Id.* at ¶ 21 (quoting TOS at § 4). Next, Nieves avers that she clicked the www.lyft.com/cities hyperlink, and, under the heading for Atlantic City, New Jersey, was directed to a page entitled, "How Lyft Works" (the "How Lyft Works Page"). FAC ¶ 22.

Nieves alleges that while perusing the How Lyft Works Page, she discovered a tool that allows prospective Riders to calculate the estimated cost of a Lyft ride from one location to another (the "Trip Estimator"). *Id.* at ¶¶ 22-23. After entering the relevant inputs into the Trip Estimator, Nieves was informed that a trip from Long Branch, New Jersey to Newark Liberty International Airport in a basic four-seat Lyft vehicle would cost the prospective Rider $86.00. *Id.* at ¶ 23. Nieves alleges that she clicked an icon next to the estimated quote, and was brought to a page explaining that the quote estimate consisted of the following charges:

- Minimum Fare:     $7.00
- Pickup:     $2.40
- Per Mile:     $1.78
- Per Minute     $0.16

- $2.05 Service fee will be added to all rides.

*Id.* at ¶ 23.

Nieves alleges that, based on the language of § 4 of the TOS, read in conjunction with the information contained in the How Lyft Works Page, she "reasonably believe[d]" that all Fares are calculated by reference to a base fare, service fee, applicable tolls and fees, and a cost per mile and per minute GPS calculation, which GPS calculation could vary based upon a change of destination, multiple stops, cancellation fees, or other ancillary costs and fees. *Id.* at ¶¶ 24-28. Nieves further alleges that she "reasonably understood" that Lyft would provide Quoted Fares to Riders through the Lyft Platform in the same manner that it provides estimates in the Trip Estimator. *Id.*

According to the FAC, Nieves then read the "Payments" section of the TOS. *Id.* at ¶ 29. Specifically, Nieves points to the second sentence of the first paragraph of that section, which provides that "'[a]ll Fare payments are subject to a Lyft Commission . . . .'" *Id.* (quoting TOS at § 5). Nieves avers that a "reasonable reading of this sentence finds the language 'subject to' after the word 'Fare' to mean 'less' or 'minus'"; *i.e.*, that the "Fare payment to a Driver would be the Fare charged the Rider less the Lyft Commission." FAC ¶ 29. Nieves alleges that her reading is supported by the next sentence of § 5, which provides, "'You will *also receive* any tips provided by Riders to you and tips will not be subject to any Lyft Commission.'" *Id.* at ¶ 29 (quoting TOS at § 5) (emphasis added). In that regard, Nieves alleges that "[r]eading the words 'also receive" in the third sentence of the paragraph in concert with the second sentence . . . results in the conclusion that a driver under the TOS is to receive the fare charged to the customer less Lyft's commission." FAC ¶ 29.

The FAC alleges, next, that to determine Lyft's Commission, Nieves read the "Commission" bullet point within § 5 of the TOS. *Id.* at ¶ 31. As set forth, *supra*, that provision states that Lyft retains a Commission for each ride, and that "[t]he amount of the applicable Commission will be communicated to you in a Commission schedule through the Driver portal." TOS at § 5. According to the FAC, the TOS does not recite the terms of the applicable Commission schedule (the "Commission Schedule"), provide a link to the Commission Schedule, or attach the Commission Schedule to the TOS as an exhibit, addendum, or rider. *See* FAC ¶¶ 31-32.

Nieves alleges that, because the TOS did not offer useful guidance on how to find the Commission Schedule, she performed an Internet search of the phrase "Lyft Commission schedule" on Google's web search engine. *Id.* at ¶ 32. Nieves avers that, upon searching the phrase "Lyft Commission schedule" in 2016, she found a link for Lyft's "Help Center." *Id.* at ¶ 33. Within the Help Center, Nieves clicked on a page entitled, "Lyft's commission structure" (the "Commission Structure Page"), *id.*, which provides:

**Lyft's commission structure**

To provide a great platform and keep the community growing, Lyft takes a commission from passenger fare.

Lyft's commission structure on *variable fare rides*:
- For drivers who applied **before 12 am on Jan. 1, 2016:** 20% commission from the variable fare (i.e., the base charge, incremental per minute and per mile charges, as adjusted by any Prime Time in effect)
- For drivers who applied **after 12 am on Jan. 1., 2016:** 25% commission from the variable fare
- For a limited time, Premier, Lux, and Lux SUV rides will have the same commission as the above

**Variable fare** means any fare that isn't set in advance, which may be changed by any Prime Time in effect. Variable fare includes a ride's base charge, any incremental per minute charges, and any incremental per mile charges.

*For rides where Lyft quotes the passenger a fare in advance, drivers earn the same per minute and per mile payments that they would for a ride with variable fare of the same type. In those cases Lyft retains the difference between the passenger payment and your payout as the commission.*

Lyft doesn't take commission from tips, which passengers can add easily through the app or give drivers as cash. That's right: drivers always keep 100% of tips whether it's a buck or a Benjamin.

Full terms and details can be found in the driver commission schedule of the Driver Dashboard.

Lyft's Commission Structure Page, FAC, Ex. B (italics added).

According to the FAC, based on her reading of the Commission Structure Page and the TOS, Nieves understood that Lyft Drivers would receive the Fare charged to the Rider (whether Lyft ultimately charged the Rider the Quoted Fee or a Variable Fee), minus either a 20% or 25% Commission. FAC ¶ 33. Nieves avers that her conclusion is supported by the provision in Commission Structure Page stating, "'For rides where Lyft quotes the passenger a fare in advance, drivers earn the same per minute and per mile payments that they would for a ride with variable fare of the same type.'" *Id.* at 34 (quoting Lyft's Commission Structure Page). In that regard, Nieves claims that "[a] reasonable reading of this provision supports the conclusion that the [Q]uoted [F]are is calculated based on the same base charge plus time and distance GPS calculation as the [V]ariable [F]are, with the latter being used when an adjustment to the [Q]uoted [F]are must be made because a Rider changed his/her destination, requested multiple stops, had to be assessed a damage fee, a cancellation fee, and/or other applicable ancillary costs and fees."[3] FAC ¶ 34.

---

[3] As the Court will discuss, *infra*, Nieves further alleges that the section of Lyft's Commission Structure Page providing that "[i]n those cases Lyft retains the difference between the passenger payment and your payout as the commission" is confusing, because it conflicts with the provision in § 5 of the TOS stating that "[a]ll Fare payments are subject to a Lyft Commission," followed by "[y]ou will also receive any tips provided by Riders to you . . . ." FAC ¶ 35.

According to the FAC, because the TOS did not instruct Drivers on how to find the Commission Schedule, Nieves neither saw nor read the Commission Schedule prior to registering as a Lyft Driver. *Id.* at ¶ 42. Rather, the FAC alleges that Nieves agreed to the TOS "based on the totality of information made available in Sections 4 and 5 of the TOS, in the [How Lyft Works Page], and in the [Commission Structure Page] . . . ." *Id.* at ¶ 37. The FAC further alleges that Nieves did so based on the "objectively reasonable understanding" that, as a Driver who had registered after January 1, 2016, she would be entitled to 75% of the Fare charged the Rider, whether Quoted or Variable. *Id.*

The FAC alleges, next, that in October 2017, Nieves received a message from Lyft through her Driver portal, informing Nieves that she would not be able to continue as a Driver unless she updated her Driver application. *Id.* at ¶ 38. After updating her Driver application through the Lyft App, Nieves attempted to locate the Commission Schedule through the Driver portal. *Id.* at ¶ 39. Nieves alleges that locating the Commission Schedule required her to open the Lyft App and engage in a circuitous six-step process. *Id.* at ¶¶ 39-40. In any event, Nieves alleges that her reading of the Commission Schedule did not alter her conclusion that, based on the terms of the TOS, the How Lyft Works Page, and the Commission Structure Page, Drivers are entitled to 75-80% of the Fare that Lyft charges its Riders, whether Quoted or Variable. *Id.* at ¶ 43.

According to the FAC, Lyft breached its contractual obligations to Nieves and the putative class of Lyft Drivers that Nieves seeks to represent by calculating Driver payments based on the actual time and distance driven, as opposed to the Fare charged Riders. *Id.* at ¶¶ 44-45. To support her claims, Nieves includes mobile phone screen shots of a trip that she completed on October 10, 2017. *See id.* at ¶¶ 45-46. The screen shot from the Rider's phone

indicates that Lyft charged the Rider a total fare of $44.57.  *Id.* at ¶ 45.  Nieves alleges that she should have received a corresponding payment from Lyft of $31.38 (75% of $44.57 minus Lyft's $2.05 Service Fee).  *Id.* at ¶ 46.  However, according to the FAC, the Lyft Platform represented to Nieves that the fare (before tip) for this same trip was $36.87, and thus, that instead of receiving $31.38 for the trip, Nieves only received $27.65 (75% of $36.87), a difference of $3.73.  *Id.*

### 2.      *Plaintiff Teddy Solomon*

Putative Plaintiff Teddy Solomon, a resident of Long Branch, New Jersey, registered as a Lyft Driver in 2014, but has only provided Services as a Driver since December 2016.  *Id.* at ¶ 7. The allegations in the FAC pertaining to Solomon are near carbon copies of Nieves' allegations. In that regard, the FAC alleges that prior to becoming an active Driver for Lyft in December 2016, Solomon read and agreed to the same version of the TOS as Nieves.  *Id.* at ¶ 53. According to the FAC, like Nieves, Solomon read sections 4 and 5 of the TOS in conjunction with the How Lyft Works Page, and understood that Lyft's payments to Driver would consist of the Fare charged to the Rider for the same transaction, minus Lyft's Commission.  *See Id.* at ¶¶ 55-65.

As was the case with Nieves, the FAC further alleges that Solomon was unable to find the Commission Schedule through either the TOS or a Google search.  *Id.* at ¶¶ 65-66.  Like Nieves, Solomon's Google search led him to Lyft's Help Center, where he was able to locate Lyft's Commission Structure Page.  *Id.* at ¶¶ 66-68.  The FAC alleges that Solomon read and understood the Commission Structure Page in the same manner as Nieves, *i.e.*, that the Driver would receive the Fare charged to the Rider, whether that Fare was derived from a Variable Fare or a Quoted Fare, minus a 20-25% Commission.  *See id.* at ¶¶ 68-70.  The FAC further alleges

that Solomon's understanding of how Drivers are compensated under the TOS did not change after he received the Commission Schedule through the Driver portal on July 13, 2017. *Id.* at ¶¶ 72-74.

Next, The FAC asserts that Lyft breached the terms of the TOS it entered with Solomon by calculating Solomon's Driver payments based on Fares that differed from the Fare Lyft charged Riders for the same transaction. *Id.* at ¶ 75. For example, the FAC alleges that on August 9, 2017, Solomon completed a trip for which Lyft charged the Rider a Fare of $40.00. *Id.* at ¶ 76. The FAC further alleges that although Solomon should have received a ride payment from Lyft of $30.86 (80% of the $40.00 less the $2.05 Service Fee due to Lyft), the Lyft Platform represented that the Fare for that trip was only $29.74. *Id.* at ¶ 77. As a result, the FAC alleges that Solomon "only received 80% of the 29.74, or $23.79 for the ride rather than the $30.36 he was entitled to, a difference of $6.57." *Id.* Similarly, the FAC alleges that for a ride on August 14, 2017, Solomon was underpaid by Lyft in the amount of $7.35.[4] *See id.* at ¶¶ 78-79.

### 3. *Plaintiffs' Claims*

Based on the allegations detailed above, the FAC asserts four causes of action against Lyft. Counts One and Two assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing, alleging that Lyft breached the terms of the TOS by calculating Driver payments based on a different Fare than the Fare that Lyft charged Riders for the same transaction. *See id.* at FAC at 44-47. Count Three asserts a claim for fraud, alleging

---

[4] The FAC also includes an example not involving Plaintiffs, where although a Rider was charged a Fare of $20.55 for a trip with Lyft, the Driver for that transaction was allegedly compensated based on a Fare of $18.03, and thus, was allegedly underpaid in the amount of $.31. FAC ¶¶ 80-81.

that Lyft's failure to inform Drivers that the amount being represented to them as the Fare charged to Riders was not in fact the full Fare, but rather an amount less than what the Rider was charged. *See id.* at 47-48. Count Four asserts a claim for unjust enrichment in the alternative, alleging that Lyft "has been unjustly enriched" by receiving and retaining "Payments from Lyft Riders beyond those promised in [Lyft's] agreement with its Lyft Drivers." *Id.* at 48. Specifically, Plaintiffs' unjust enrichment claim is based on the allegation that Lyft "retained a larger portion of the passenger fare than they promised they would retain in the TOS." *Id.* Among other relief, the FAC seeks an award of money damages and an injunction against Lyft. *See id.* at 48-49.

## II.     **PROCEDURAL HISTORY**

Nieves filed her original Complaint on August 15, 2017. ECF No. 1. Lyft filed the instant Motion to Dismiss on October 6, 2017. ECF No. 9. On November 20, 2017, Plaintiffs filed an Opposition to Lyft's Motion, as well as a Cross-Motion for Leave to File the proposed FAC. ECF Nos. 16-17. On December 21, 2017, Lyft filed a Reply with respect to the Motion to Dismiss, and an Opposition to Plaintiffs' Cross-Motion. ECF NO. 21.

## III.     **STANDARD OF REVIEW**

### A.     **Federal Rule of Civil Procedure 12(b)(1)**

Under Federal Rule of Civil Procedure 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim. *See* FED. R. CIV. P. 12(b)(1). "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007); *see St. Thomas–St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("The issue of standing is jurisdictional."). "On a motion to dismiss for lack of

standing, the plaintiff bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Ballentine*, 486 F.3d at 810 (citations and internal quotation marks omitted).

In evaluating a Rule 12(b)(1) motion to dismiss, the reviewing court must first determine whether the motion "presents a 'facial' attack or a 'factual' attack on the claim at issue, because that distinction determines how the pleading must be reviewed." *Constitution Party of Pennsylvania v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'" *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted); *see Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (observing that in reviewing a facial challenge, which contests the sufficiency of the pleadings, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."). A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co.*, 836 F.3d at 268. The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n. 3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips

the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig*

*Drug Co.*, 836 F.3d at 268.

> **B.      Federal Rule of Civil Procedure 12(b)(6)**

In reviewing a motion to dismiss for failure to state a claim upon which relief can be

granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation

marks and citation omitted).  Although Federal Rule of Civil Procedure 8(a)[5] does not require

that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion

to dismiss, a complaint must contain sufficient factual allegations to raise a plaintiff's right to

relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v.*

*Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.*

---

[5] In *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court reaffirmed that Federal Rule of Civil Procedure 8(a) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In accordance with the pleading requirements set forth in *Twombly* and *Iqbal*, the Third Circuit has formulated "a three-step process for district courts to follow in reviewing the sufficiency of a complaint." *Robinson v. Family Dollar Inc.*, 679 F. App'x 126, 131 (3d Cir. 2017); *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the reviewing court "must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citation, quotation marks, and brackets omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (citation and quotation marks omitted). Finally, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (citation, quotation marks, and brackets omitted). This last step of the plausibility analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### C.  Federal Rule of Civil Procedure 15(a)

In addition to opposing Defendant's Motion to Dismiss, Plaintiffs have moved, pursuant to Federal Rule of Civil Procedure 15(a), for leave to file the FAC. Under Rule 15(a), a plaintiff may amend his or her pleading once as a matter of course. *See* FED. R. CIV. P. 15(a). At all other times, the plaintiff must seek leave of the court to amend her complaint, and "[t]he court should freely give leave when justice so requires." *Id.* When considering a motion to amend, "[t]he Supreme Court has instructed that although 'the grant or denial of an opportunity to amend is within the discretion of the District Court, . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules.'" *Shane v. Fauver*, 213 F.3d

113, 115 (3d Cir. 2000) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Nonetheless, a court may deny a plaintiff leave to amend for a variety of reasons, including undue delay, bad faith, dilatory motive, prejudice, and futility.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).  Under Third Circuit precedent, a "futile" amendment is one that fails to state a claim upon which relief could be granted.  *Burlington*, 114 F.3d at 1434; *Grayson v. Mayview State Hospital*, 293 F.3d 103, 113 (3d Cir. 2002).  Thus, in determining whether a complaint, as amended, is futile, courts apply the sufficiency standard set forth under Rule 12(b)(6).  *Shane*, 213 F.3d at 115.  "Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency."  *Id.*

## IV.    DISCUSSION

Defendant moves to dismiss the FAC for:  (A) lack of Article III standing; and (B) failure to state a claim upon which relief can be granted.  The Court will examine each of those bases for dismissal, in turn.

### A.    Article III Standing

Article III of the United States Constitution confines the scope of federal judicial power to the adjudication of "cases" or "controversies."  U.S. CONST. art. III, § 2.  This "bedrock requirement," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), protects the system of separation of powers and respect for the coequal branches by restricting the province of the judiciary to "decid[ing] on the rights of individuals."  *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803).  Indeed, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the

constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("In order to remain faithful to this tripartite structure, the power of the Federal Judiciary may not be permitted to intrude upon the powers given to the other branches.").

Courts have developed several justiciability doctrines to enforce the "case" or "controversy" requirement. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). Among those doctrines, "[t]he Art[icle] III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important . . . ." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The seminal standing question is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Seldin*, 422 U.S. at 498-99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "In the context of class actions, Article III standing 'is determined vis-a-vis the named parties.'" *McCray v. Fid. Nat. Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012) (quoting *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 306 (3d Cir. 1998)).

To satisfy the "irreducible constitutional minimum" of Article III standing, the plaintiff must establish three well-settled elements:

> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.

> Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.

Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations, alterations, and citations omitted); *see Spokeo*, 136 S. Ct. at 1547 ("The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.").

The standing inquiry in this case centers on the "'[f]irst and foremost' of standing's three elements," injury-in-fact. *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). "The injury-in-fact requirement exists to assure that litigants have a 'personal stake' in the litigation." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005); *see Cottrell v. Alcon Labs.*, 874 F.3d 154, 162 (3d Cir. 2017) ("The purpose of the injury-in-fact requirement . . . is 'to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.'") (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). "Injury-in-fact is not Mount Everest." *Danvers*, 432 F.3d at 294. It demands only that the plaintiff allege "some specific, 'identifiable trifle' of injury." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982) (citation omitted).

To carry its burden on the injury-in-fact requirement, a "plaintiff must claim 'the invasion of a concrete and particularized legally protected interest' resulting in harm 'that is actual or imminent, not conjectural or hypothetical.'" *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (citation omitted). An injury is "concrete" where it is "real, or distinct and palpable, as opposed to merely abstract." *Id.* (citation omitted); *see Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). To that end, allegations of a potential future injury, or the mere possibility of a future injury, will not establish standing, s*ee Whitmore*, 495 U.S. at 158 155; *Reilly v.*

*Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ("Allegations of 'possible future injury' are not sufficient to satisfy Article III."), and "[p]laintiffs do not allege an injury-in-fact when they rely on a 'chain of contingencies' or 'mere speculation.'" *Finkelman*, 810 F.3d at 193 (quoting *Aichele*, 757 F.3d at 364). An injury is "particularized" where it affects the plaintiff in a "personal and individual way." *Lujan*, 504 U.S. at 560 n. 1. Thus, the injury-in-fact test "requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972); *see In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

Here, Defendant argues that the Court should dismiss the FAC in its entirety, because Plaintiffs have failed to allege a concrete, particularized injury-in-fact with respect to each of their claims.[6] In that regard, Defendant maintains that each of the claims in the FAC is premised upon the allegation that Lyft calculates Driver payments based upon Variable Fares, as opposed to Quoted Fares, which Plaintiffs allege results in underpayments to Drivers when compared to what Drivers would receive on a Quoted Fare. Defendant contends that these allegations are insufficient to demonstrate Article III standing, because they require this Court to assume a hypothetical scenario in which a Driver could have been underpaid, rather than showing that Plaintiffs themselves were injured as a result of the disputed conduct. Based on this deficiency, Defendant argues that Plaintiffs fail to meet the injury-in-fact requirement, because each of Plaintiffs' claims fails to satisfy the pleading standard mandated under *Twombly* and *Iqbal*, rendering the theory of Plaintiffs' case implausible.[7]

---

[6] Defendant raises a generalized standing argument that it argues applies equally to each of Plaintiffs' claims, as opposed to claim-specific standing arguments.

[7] Defendant also argues that the original Complaint is bereft of any allegations that demonstrate injury-in-fact, and that Plaintiffs cannot rely upon the proposed FAC to demonstrate Article III standing. However, because this Court has already indicated that it will analyze Defendant's

Contrary to Defendant's arguments, I find that the FAC's allegations of economic injury are sufficient to satisfy the injury-in-fact requirement. Significantly, the Third Circuit has recognized that economic injury is one of the paradigmatic forms of injury-in-fact. *Danvers*, 432 F.3d at 291; *see Cottrell*, 874 F.3d at 163 ("Typically, a plaintiff's allegations of financial harm will easily satisfy each of these components, as financial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact.") (citation omitted). As a result, "where a plaintiff alleges financial harm, standing 'is often assumed without discussion.'" *Cottrell*, 874 F.3d at 163 (quoting *Danvers*, 432 F.3d at 293). Here, the FAC alleges that Lyft was required, under the terms of the TOS, the How Lyft Works Page, and the Commission Structure Page, to calculate payments to Drivers, including Plaintiffs, based on the Fare that Lyft charged Riders for the same transaction. However, the FAC further alleges that where Riders were charged a Quoted Fare rather than a Variable Fare, Lyft nonetheless paid its Drivers based on a Variable Fare rate, resulting in systemic underpayments to Drivers. The FAC includes specific examples of how Lyft's conduct resulted economic harm to Plaintiffs, including allegations that: (i) for an October 10, 2017 ride, Nieves was underpaid in the amount of $3.73, FAC ¶¶ 45-56; and (ii) for an August 9, 2017 ride, Solomon was underpaid by $6.57. *Id.* at ¶¶ 76-77. Accordingly, because the FAC alleges concrete economic injury that affected Plaintiffs in a personalized, individual way, I find that Plaintiffs have met their burden of alleging injury-in-fact.

Moreover, Defendant's argument that Plaintiffs' theory of the case is implausible conflates the standing analysis with a merits analysis. As the Third Circuit has explained, in determining whether a plaintiff has sufficiently alleged injury-in-fact, courts separate the

---

Motion by looking to the FAC, the Court's standing analysis will also look to the allegations contained in the FAC.

"standing inquiry from any assessment of the merits of the plaintiff's claim." *Cottrell*, 874 F.3d at 162; *see Bond v. United States*, 564 U.S. 211, 219 (2011) ("[T]he question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute, and conflation of the two concepts can cause confusion.") (internal citation omitted). Thus, although the standing inquiry may reference the "nature and source of the claim asserted," standing "in no way depends on the merits" of the plaintiff's claim. *Seldin*, 422 U.S. at 500; *see Cottrell*, 874 F.3d at 162 ("To maintain [the] fundamental separation between standing and merits at the dismissal stage, we assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims."). Accordingly, the standing question is not whether Plaintiffs will ultimately prevail on their theory of harm, but whether Plaintiffs have alleged a concrete injury, and whether Plaintiffs are the proper parties to bring such a claim. *See Cottrell*, 874 F.3d at 162 (observing that the focus of the injury-in-fact analysis "remains on whether the plaintiff is the proper party to bring those claims."). Here, because Plaintiffs have alleged concrete economic harm that affects them in a personal way, Plaintiffs have sufficiently alleged injury-in-fact.

## B.     Plaintiffs' Claims

Because Plaintiffs have met their burden of alleging injury-in-fact, the Court has jurisdiction to address whether Plaintiffs have satisfied the pleading standards with respect to the four claims asserted in the FAC. Specifically, the FAC asserts claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; and (4) unjust enrichment. The Court will address each of those claims, in turn.

### 1.     *Breach of Contract*

In Count One of the proposed FAC, Plaintiffs assert a claim for breach of contract, alleging that Lyft breached the terms of the TOS by calculating Driver payments based on a

different Fare than the Fare charged to Lyft Riders for the same transaction. *See* FAC at 44-45. Specifically, Plaintiffs contend that under their collective reading of the TOS, the How Lyft Works Page, and the Commission Structure Page, Lyft is required to pay Drivers in an amount equal to the Fare that Lyft charges Riders for the same transaction, less a 20-25% commission and applicable fees. *See id.* Plaintiffs allege that Lyft breached the TOS, because in cases where Lyft charged the Rider based on a Quoted Fare, Lyft compensated the Driver based on a Variable Fare for that ride (*i.e.*, based on the actual time and distance driven). *See id.*

Defendant moves to dismiss Plaintiffs' breach of contract claim, arguing that Plaintiffs fail to point to any provision in the TOS that requires Lyft to pay Drivers based on the Fare that Lyft charges its Riders for the same transaction. To the contrary, Defendants argue that the plain and unambiguous language of the Commission Structure Page provides that where a Rider is charged a Quoted Fare, the Driver is compensated based on a Variable Fare, with Lyft retaining the difference between the Variable Fare and the Quoted Fare as its Commission.

To establish a claim for breach of contract,[8] "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the

---

[8] I note that the TOS contains a choice of law provision, which provides:

> Except as provided in Section 17, this Agreement shall be governed by the laws of the State of California without regard to choice of law principles. This choice of law provision is only intended to specify the use of California law to interpret this Agreement and is not intended to create any other substantive right to non-Californians to assert claims under California law whether by statute, common law, or otherwise.

TOS at § 21. Nonetheless, the parties have not engaged in a choice-of-law analysis by identifying any conflicts between the laws of New Jersey and California as to Plaintiffs' breach of contract claim. Instead, the parties have used the laws of those States interchangeably. *See* Def.'s Mot. to Dismiss ("Def.'s Br."), at 15-16; Pls.' Br. at 8-9; Def.'s Reply at 12, 19-20. Accordingly, for the purposes of this Motion, the Court will apply the contract laws of both states, and defer a choice of law analysis to a later stage when the record is fully developed. *See Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997) ("Under general conflict of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question.");

contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007); *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) ("[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.").

At the outset, the Court notes that Plaintiffs present seemingly inconsistent arguments regarding the first element of the *prima facie* case for a breach of contract claim, the existence of a valid and enforceable contract. The law respecting what constitutes a valid contract is clear. "A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992). "In order for a contract to form, . . . there must be a 'meeting of the minds,' as evidenced by each side's express agreement to every term of the contract." *State v. Ernst & Young, L.L.P.*, 386 N.J. Super. 600, 612 (App. Div. 2006) (citation omitted); *see Newfield Fire Co. No. 1 v. Borough of Newfield*, 439 N.J. Super. 202, 214 (App. Div. 2015) ("[A] contract requires a meeting of the minds and mutual assent."). "This signifies that each party to the contract must have been fairly informed of the contract's terms before entering into the agreement." *Hoffman v. Supplements Togo Mgmt., LLC*, 419 N.J. Super. 596, 606 (App. Div. 2011). Accordingly, "[w]here there is a misunderstanding between the parties pertaining to one of the material terms of an agreement, there is no meeting of the minds, and therefore no contract." *Pac. All. Grp. Ltd. v. Pure Energy Corp.*, No. 02-4216, 2006 WL

---

*Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 490-91 (D.N.J. 2009) (finding that the court was unable to make "the fact-intensive choice-of-law determination on the record before it," and deferring the choice-of-law decision until the factually record was more fully developed).

166470, at \*3 (D.N.J. Jan. 23, 2006) (citing *Richardson v. Union Carbide Industrial Gases, Inc.*, 347 N.J. Super. 524, 533 (App. Div. 2002)); *see Weichert*, 128 N.J. at 435 ("Where the parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable.").

Here, Plaintiffs argue, on one hand, that the parties entered into a valid contract, the TOS. *See* Pls.' Br. in Opp. to Def.'s Mot. ("Pls.' Br."), at 10 ("There is no disputing that [Plaintiffs] and Defendant Lyft entered into a contract, . . . the TOS."). On the other hand, however, the allegations that form Plaintiffs' breach of contract claim suggest that there was no meeting of the minds on an essential term of the parties' agreement – Lyft's Commission. In that regard, it is undisputed that the TOS itself does not set forth the terms of Lyft's Commission, but rather, provides that Lyft's Commission will be communicated to Drivers in a Commission Schedule through the Driver portal. *See* TOS at § 5. In their breach of contract claim, however, Plaintiffs allege that they did not agree to the terms set forth in the Commission Schedule, because that document was inaccessible to Plaintiffs at the time of their agreements.[9] Instead, Plaintiffs argue

---

[9] Specifically, Plaintiffs argue that although the Commission Schedule, a separate document from the TOS, is referenced in the TOS, Defendant cannot rely on that document as setting forth the terms of Lyft's Commission, because the Commission Schedule was not incorporated by reference. The doctrine of incorporation by reference allows parties to "incorporate contractual terms by reference to a separate, contemporaneous document . . . including a separate document which is unsigned." 11 WILLISTON ON CONTRACTS § 30:25 (4th ed. 2016). "In order for there to be a proper and enforceable incorporation by reference of a separate document, the document to be incorporated must be described in such terms that its identity may be ascertained beyond doubt and the party to be bound by the terms must have had 'knowledge of and assented to the incorporated terms.'" *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 533 (App. Div. 2009). Here, Plaintiffs argue that the Commission Schedule was not incorporated by reference into the TOS, because the TOS did not recite the terms of the Commission Schedule, provide a link on how to access the Commission Schedule, or attach the Commission Schedule as an addendum or exhibit. In that regard, the FAC, as currently pled, alleges that Plaintiffs had no knowledge of the terms of the Commission Schedule, and thus, could not have assented to its terms. Taking those allegations as true, as this Court must do for the purposes of the instant Motion, the Court cannot find that the Commission Schedule was

that the terms of the Commission Schedule Page – the document found online by Plaintiffs – formed their understanding of Lyft's Commission at the time of their agreements. Accordingly, because Lyft's Commission constitutes an essential term of the parties' agreements, and because Plaintiffs allege that they were denied access to the Commission Schedule prior to signing those agreements, it appears that Plaintiffs have called into question whether a meeting of the minds ever occurred with respect to Lyft's Commission, and thus, whether a valid and enforceable contract was formed. Indeed, if prospective Drivers could not access the Commission Schedule through the Driver portal – which cannot be determined on a motion to dismiss – then there may be no contract between Plaintiffs and Lyft. Nonetheless, the Court will proceed to the other elements of the *prima facie* case for Plaintiffs' breach of contract claim, because, as I explain, *infra*, even assuming the Commission Structure Page accurately set forth the terms of Lyft's Commission, Plaintiffs have still failed to state a claim for breach of contract.

Prior to analyzing whether Plaintiffs have met their burden of demonstrating that Defendant breached the TOS, I will briefly set forth the well-settled principles of contract interpretation that guide my analysis. "Courts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (quoting *Caruso v. Ravenswood Developers, Inc.*, 337 N.J. Super. 499, 506 (App. Div. 2001)); *see Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992) ("The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties."). It is well-settled that "if the contract into which the parties have entered is clear, then it must be enforced" as written.

---

incorporated by reference. Therefore, the Court will not analyze the terms of the Commission Schedule on this Motion.

*Maglies v. Estate of Guy*, 193 N.J. 108, 143 (2007); *see Manahawkin Convalescent*, 217 N.J. at 118 ("If the language of a contract 'is plain and capable of legal construction, the language alone must determine the agreement's force and effect.'") (quoting *Twp. of White v. Castle Ridge Dev. Corp.*, 419 N.J. Super. 68, 74-75 (App. Div. 2011)); *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 868 (1998) (""If contractual language is clear and explicit, it governs."). In that connection, courts cannot "supply terms to contracts that are plain and unambiguous," or "make a better contract for either of the parties than the one which the parties themselves have created." *Maglies*, 193 N.J. at 143; *see Matter of Cty. of Atl.*, 230 N.J. 237, 254 (2017) ("'Courts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made.'") (citation omitted); *Series AGI W. Linn of Appian Grp. Inv'rs DE LLC v. Eves*, 217 Cal. App. 4th 156, 164 (2013) ("[C]ourts will not rewrite contracts to relieve parties from bad deals nor make better deals for parties than they negotiated for themselves.").

An ambiguity exists if "the terms of the contract are susceptible to at least two reasonable alternative interpretations . . . ." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008); *Nester v. O'Donnell*, 301 N.J. Super. 198, 210 (App. Div. 1997); *see Eriksson v. Nunnink*, 233 Cal. App. 4th 708, 722 (2015) ("An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing."). Nonetheless, a "court should not torture the language of [a contract] to create ambiguity." *Stiefel v. Bayly, Martin & Fay of Connecticut, Inc.*, 242 N.J. Super. 643, 651 (App. Div. 1990); *see Culligan v. State Comp. Ins. Fund*, 81 Cal. App. 4th 429, 435 (2000) ("Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists."). Ultimately, the determination of "whether a contract provision is clear or ambiguous is a question of law," *Grow Co., Inc. v.*

*Chokshi*, 403 N.J. Super. 443, 476 (App. Div. 2008); *Travelers Commercial Ins. Co. v. Jennifer A.*, 699 F. App'x 607, 609 (9th Cir. 2017) (explaining that, under California law, "contractual ambiguity is a question of law for the court to decide . . . ."), and, "[e]ven in the interpretation of an unambiguous contract, [courts] may consider 'all of the relevant evidence that will assist in determining [its] intent and meaning.'" *Manahawkin Convalescent*, 217 N.J. at 118 (quoting *Conway v. 287 Corporate Ctr. Assocs.*, 187 N.J. 259, 269 (2006)).

The first step in determining whether Plaintiffs have plausibly alleged that Defendant breached the TOS requires this Court to determine the scope of Defendant's obligations under that agreement. To do so, I begin with the language of the TOS itself. Payments to Lyft Drivers are governed by § 5 of the TOS, which provides, in relevant part:

> If you are a Driver, you will receive payment for your provision of Services. All Fare payments are subject to a Lyft Commission, discussed below. You will also receive any tips provided by Riders to you, and tips will not be subject to any Lyft Commission. Lyft will process all payments due to you through its third party payments processor. You acknowledge and agree that such amounts shall not include any interest and will be net of any amounts that we are required to withhold by law.
>
> - **Commission**. In exchange for permitting you to offer your Services through the Lyft Platform and marketplace as a Driver, you agree to pay Lyft (and permit Lyft to retain) a fee based on each transaction in which you provide Services (the "Commission"). The amount of the applicable Commission will be communicated to you in a Commission schedule through the Driver portal. Lyft reserves the right to change the Commission at any time in Lyft's discretion based upon local market factors, and Lyft will provide you with notice in the event of such change. Continued use of the Lyft Platform after any such change in the Commission calculation shall constitute your consent to such change.

TOS at § 5.

Plaintiffs argue that the second and third sentences of § 5's first paragraph, when read together, provide that a "fare payment to a driver would be the Fare charged the Rider less the Lyft Commission." Pls.' Br. at 11. To do so, Plaintiffs assert that the second sentence of this paragraph – "All Fare payments are subject to a Lyft Commission," TOS at § 5 – provides that

Lyft will deduct a Commission from all "Fare payments." Pls.' Br. at 11. That point is not in dispute. *See* Def.'s Reply to Pls.' Opp. ("Def.'s Reply"), at 15. Plaintiffs then argue that reading the words "also receive" in the third sentence – "You will also receive any tips provided by Riders to you, and tips will not be subject to any Lyft Commission," TOS at § 5 – in conjunction with the second sentence "results in the objective conclusion that a driver under the TOS is to receive the fare charged the customer less Lyft's Commission." Pls.' Br. at 11. However, Plaintiffs' position reads those sentences in isolation, without reference to the first sentence that refers to Fare payments *to Drivers*.

The language of § 5 provides no basis for finding that Lyft is contractually obligated to pay its Drivers based on the Fare charged to Riders. Significantly, the first paragraph of § 5 indicates that § 5 governs Lyft's payments *to Drivers*. *See* TOS at § 5 ("If you are a *Driver*, you will receive *payment* for your provision of Services.") (emphasis added). Notably absent from the first paragraph of § 5 is any reference to the Fare that Lyft charges its Riders. Moreover, although § 5 provides that all Fare payments to Lyft Drivers are subject to a Lyft Commission, the specific terms of Lyft's Commission are not set forth in § 5 or in any other portion of the TOS. Instead, § 5 simply provides that for each transaction, Lyft's Commission "will be communicated to [the Driver] in a Commission schedule through the Driver portal." TOS at § 5. Accordingly, because the Court cannot determine, from the terms of the TOS alone, what constitutes the applicable Commission, much less find that Lyft had a contractual obligation to pay its Drivers based on the Fare Lyft charged its Riders for the same transaction, Plaintiffs cannot plausibly allege a claim for breach of contract by pointing to the terms of the TOS alone. Stated another way, because the terms of the TOS do not expressly set forth the terms of Lyft's

Commission or connect Driver payments to Rider Charges, the Court cannot find, from the language of the TOS standing alone, that Lyft breached its contractual obligations to Plaintiffs.

Recognizing as much, Plaintiffs rely on the language of the Commission Structure Page in arguing that they have plausibly alleged a claim for breach of contract. As noted, although the TOS references the Commission Schedule, Plaintiffs allege that they could not find the Commission Schedule at the time of their agreements, and neither party has produced on this Motion the Commission Schedule that was in place at that time. Instead, Plaintiffs allege that they read and relied upon the Commission Structure Page found through Lyft's Help Center,[10] and argue that the language therein supports their claim for breach of contract. I disagree.

At the outset, the Court questions Plaintiffs' ability to rely on the language of the Commission Structure Page to state a claim for breach of contract. As the Court has already explained, the TOS provides that Lyft will communicate its Commission to Drivers in a Commission Schedule through the Driver portal, but Plaintiffs allege that the Commission Schedule was inaccessible at the time of their agreements with Lyft. While the Court is bound to take that allegation as true for the purposes of this Motion, it is also undisputed that the Commission Structure Page is not referenced anywhere in the TOS, but rather, was located by Plaintiffs through a Google search. Thus, although Plaintiffs' alleged inability to access the Commission Schedule prior to agreeing to the TOS may raise an issue as to the formation of a valid and enforceable contract, Plaintiffs cannot unilaterally substitute a document that they found online as supplying the express terms of the TOS. Indeed, permitting Plaintiffs to do so

---

[10] I note that the TOS does contain a general reference to the Help Center. *See* TOS at § 21 ("If you have any questions regarding the Lyft Platform or Services, please contact our Customer Support Team through our <u>Help Center</u>.") (emphasis in original).

would violate the basic principle that courts cannot supply new terms to a contract. *See Maglies*, 193 N.J. at 143; *Matter of Cty. of Atl.*, 230 N.J. at 254.

Nonetheless, even taking as true, for the purposes of this Motion, that: (i) Plaintiffs read and relied on the Commission Structure Page as setting forth the applicable Commission before agreeing to the TOS; (ii) the language in the Commission Structure Page is reflective of Lyft's Commission during the relevant period[11]; and (iii) that Defendant was obligated to pay its Drivers in accordance with the Commission Structure Page, Plaintiffs have still failed to state a plausible claim for breach of contract, because the unambiguous language of the Commission Structure Page does not support Plaintiffs' theory.

The Commission Structure Page provides, in relevant part:

Lyft's commission structure on *variable fare rides*:
- For drivers who applied **before 12 am on Jan. 1, 2016:** 20% commission from the variable fare (i.e., the base charge, incremental per minute and per mile charges, as adjusted by any Prime Time in effect)
- For drivers who applied **after 12 am on Jan. 1, 2016:** 25% commission from the variable fare
- For a limited time, Premier, Lux, and Lux SUV rides will have the same commission as the above

Variable fare means any fare that isn't set in advance, which may be changed by any Prime Time in effect. Variable fare includes a ride's base charge, any incremental per minute charges, and any incremental per mile charges.

*For rides where Lyft quotes the passenger a fare in advance, drivers earn the same minute and per mile payments that they would for a ride with variable fare of the same type. In those cases Lyft retains the difference between the passenger payment and your payout as the commission.*

---

[11] The Court expresses no opinion as to whether the Commission Structure Page is part of the TOS, whether the terms of the Commission Structure Page actually reflect the applicable Commission agreed upon in the TOS, or whether that document is in any way indicative of the parties' agreement as to the applicable Commission. Rather, because Plaintiffs' claim for breach of contract is based on the language of that document, the Court simply assumes, for the purposes of this Motion alone, that the Commission Structure Page contains the operative language regarding Lyft's Commission.

Lyft's Commission Structure Page (italics added).

Plaintiffs' breach of contract claim hinges on the provision stating that "[f]or rides where Lyft quotes the passenger a fare in advance, drivers earn the same per minute and per mile payments that they would for a ride with variable fare of the same type."[12] Lyft's Commission Structure Page. Specifically, Plaintiffs contend that a reasonable reading of this provision is that the "quoted fare is calculated based on the same base charge plus time and distance GPS cost calculation as the variable fare, with the latter being used when an adjustment to the quoted fare must be made because of certain specifically identified circumstances contained within the TOS." Pls.' Br. at 22. According to Plaintiffs, "[t]his means that there should be no difference between the variable fare and the quoted fare since they are both based on time and distance," and thus, "drivers should receive the fare payment paid by the Rider less Lyft's commission and other ancillary costs." *Id.*

Contrary to Plaintiffs' arguments, the plain language of the Commission Structure Page shows that Plaintiffs' theory is implausible. First, the language identified by Plaintiffs unambiguously references how *Drivers* are paid when Lyft quotes the *Rider* a Fare in advance. *See* Lyft's Commission Structure Page ("For rides where Lyft *quotes the passenger* a fare in advance, *drivers earn* the same per minute and per mile payments that they would for a ride with

---

[12] Plaintiffs also argue, unpersuasively, that the provisions of the Commission Structure Page stating that Lyft will take a 20-25% commission from the Variable Fare indicate that Drivers must be paid based on the Fare that Lyft charges the Rider for the same transaction, less a 20-25% Commission. Pls.' Br. at 12-13. At the outset, those portions of the Commission Structure Page do not relate to the situation where the Rider is charged a Quoted Fare, and thus, are wholly irrelevant to the theory of Plaintiffs' case. Moreover, contrary to Plaintiffs' argument, those provisions do not require Lyft to compensate Drivers based on the Fare charged to Riders for the same transaction, or otherwise render Lyft's payment obligations contingent in any way on the Fare charged to Riders. Instead, the cited language merely provides that Lyft will take 20-25% "commission from the *variable fare*." Lyft's Commission Structure Page (emphasis added).

variable fare of the same type.") (emphasis added). The plain language of that provision clearly provides that where a Rider is charged a Quoted Fare, Lyft nonetheless compensates the Driver based on a Variable Fare for a ride of the same type. Indeed, were there no difference between the Variable and Quoted Fare, as Plaintiffs suggest, Lyft would have had no need to distinguish how Drivers are paid in the Quoted Fare scenario.

Moreover, to adopt Plaintiffs' interpretation "would violate 'the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions.'" *In re Stone & Webster, Inc.*, 558 F.3d 234, 247 (3d Cir. 2009) (citation omitted); *see Citisteel USA, Inc. v. Gen. Elec. Co.*, 78 F. App'x 832, 837 (3d Cir. 2003) ("Courts must strive to give effect to all provisions of a contract and not render any provision meaningless."); *Leary v. Pepperidge Farm, Inc.*, No. A-6620-05T1, 2009 WL 2426345, at *9 (N.J. Super. Ct. App. Div. Aug. 10, 2009) ("New Jersey courts endeavor to give effect to all of a contract's provisions."); *People v. Doolin*, 45 Cal. 4th 390, 413 (2009) (explaining that "'[any] contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable.'") (citation omitted). Stated another way, a reading of a contract that gives effect to all contractual provisions "'will be preferred to one which leaves a portion of the writing useless or inexplicable.'" *Leary*, 2009 WL 2426345 at *9 (citation omitted). Here, Plaintiffs' construction ignores the very next sentence of the Commission Structure Page, which provides: "In those cases Lyft retains the difference between the passenger payment and your payout as the commission." Lyft's Commission Structure Page. Plaintiffs' interpretation of the Commission Structure Page would render this retention provision superfluous, because, were there truly no difference between the Quoted Fare and the Variable Fare, there would be no "difference between the passenger payment and your [the Driver's]

payout" for Lyft to retain as a Commission. *Id.* Accordingly, Plaintiffs' interpretation of the Commission Structure Page is unpersuasive.

Indeed, recognizing that the retention provision undermines the theory of their case, Plaintiffs argue that the retention provision "is confusing and ambiguous because it runs counter" to the second and third sentences of § 5 of the TOS. Pls.' Br. at 24. Specifically, Plaintiffs construe those sentences as providing that "a driver is entitled to the fare charged the customer less Lyft's Commission," and thus, argue that "there exists no contractual authority for Lyft to 'retain the difference between the passenger payment and [the Driver's] payout as the commission.'" *Id.* As a preliminary matter, this Court has already rejected Plaintiffs' construction of § 5, and thus, the retention provision is not in conflict with § 5. Moreover, for the terms of a contractual provision to be ambiguous, they must be "susceptible to at least two reasonable alternative interpretations . . . ." *Chubb*, 195 N.J. at 238. Far from suggesting an alternative interpretation of the retention provision, Plaintiffs concede that the retention provision is inconsistent with their theory of the case. *See* Pls.' Br. at 13-14, 24. Accordingly, because the plain language of the Commission Structure Page – the document relied on by Plaintiffs in alleging that Lyft breached its contractual obligations to pay Lyft Drivers – does not support Plaintiffs' theory, Plaintiffs have failed to meet the pleading standard on their breach of contract claim.

In sum, Plaintiffs have failed to sufficiently allege a claim for breach of contract. That being said, although the plain language of the Commission Structure Page does not provide a basis for Plaintiffs' breach of contract claim, the Court will grant Plaintiffs leave to amend their breach of contract claim by identifying other contractual language, should any exist, that supports their claim. Additionally, I note that although Plaintiffs concede that they agreed to the

TOS, many of the allegations that Plaintiffs raise – including that the Commission Schedule was inaccessible – sound in contract formation; *i.e.*, whether Plaintiffs assented to the terms of the TOS. Thus, while the FAC, as pled, does not raise any defenses to formation, to the extent that Plaintiffs are seeking to challenge the formation of a TOS, they may amend their FAC to assert such a claim.

### 2. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Defendants also move to dismiss Count Two of the FAC, which asserts a claim for breach of the implied covenant of good faith and fair dealing. Plaintiffs' implied covenant claim is substantially similar to Plaintiffs' breach of contract claim – Plaintiffs allege that Lyft breached the implied covenant by failing to pay Drivers based on the Fare that Lyft charged its Riders for the same transaction. *See* FAC at 45-46. Plaintiffs also allege by failing to make the Commission Schedule accessible, Lyft concealed from Plaintiffs the fact that Lyft was not paying Drivers based on the Fare that Lyft charged Riders. *See id.*

Under New Jersey law, every party to a contract is "bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (2005); *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001) ("A covenant of good faith and fair dealing is implied in every contract in New Jersey."). While the concept of good faith is difficult to define precisely, "'[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Wilson*, 168 N.J. at 245 (citation omitted). Good faith thus excludes conduct that violates "'community standards of decency, fairness or reasonableness.'" *Id.* (citation omitted).

Here, Plaintiffs have failed to sufficiently allege a claim for breach of the implied covenant of good faith and fair dealing. First, even if the terms of the Commission Structure Page were incorporated into the TOS to form Lyft's payment obligation, Plaintiffs have failed to state an implied covenant claim, because the Court has already found that the language of the Commission Structure Page plainly and unambiguously provides that where the Rider is charged a Quoted Fare, Lyft nonetheless pays its Drivers based on a Variable Fare for that same ride. In that regard, although "a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term," the "implied covenant of good faith and fair dealing *cannot override an express term in a contract*." *Wilson*, 168 N.J. at 244 (emphasis added). Because the express language of the Commission Structure Page provides that where the Rider is charged a Quoted Fare, Lyft nonetheless compensates its Drivers by using a Variable Fare for a ride of the same type, Lyft's implied covenant claim is in direct conflict with the contract language that Plaintiffs rely on. Accordingly, Plaintiffs implied covenant claim necessarily fails.

Second, Plaintiffs' allegations regarding Lyft's failure to make the Commission Schedule accessible cannot form the basis of a claim for breach of the implied covenant of good faith and fair dealing, because those allegations go to formation of the contract, rather than its performance. In that regard, the implied covenant of good faith and fair dealing exists to ensure that neither party "'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .'" *Kalogeras v. 239 Broad Ave., L.L.C.*, 202 N.J. 349, 366 (2010) (quoting *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). Thus, "the duty of good faith and fair dealing does not apply to lack of good faith in contract formation." *Robinson v. Wingate Inns Int'l, Inc.*, No. 13 -2468, 2014 WL 4952363, at

*3 (D.N.J. Sept. 24, 2014); *see HSBC Bank USA, Nat. Ass'n v. Woodhouse*, No. A-1736-10T4, 2012 WL 1868217, at *4 (N.J. Super. Ct. App. Div. May 24, 2012) ("The implied covenant of good faith and fair dealing focuses on the performance and enforcement of a valid agreement more than it regulates contract formation."). Accordingly, because Plaintiffs' allegations regarding Lyft's failure to provide access to the Commission Schedule go to formation, rather than the performance or enforcement of the TOS, Plaintiffs have failed to plausibly allege a claim for breach of the implied covenant of good faith and fair dealing, and that claim is dismissed without prejudice.

### 3. *Fraud*

In Count Three of the FAC, Plaintiffs assert a claim for common law fraud, alleging that Lyft's failure to inform Plaintiffs that the Fare being used to calculate Driver payments would, on some occasions, differ from the Fare charged the Riders constitutes a misrepresentation of fact, which Plaintiffs relied upon in agreeing to the TOS. *See* FAC at 47-48. Defendant moves to dismiss Plaintiffs' fraud claim, arguing that Plaintiffs have failed to allege an actionable misrepresentation. In opposition, Plaintiffs identify the opening paragraph of § 5 of the TOS as the specific misrepresentation that forms their fraud claim. *See* Pls.' Br. at 26.

To state a claim for legal fraud under New Jersey law, a plaintiff must allege: "(1) a material representation by the defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intent that the plaintiff rely upon it; (4) reasonable reliance by the plaintiff; and (5) resulting damage to the plaintiff." *Weil v. Express Container Corp.*, 360 N.J. Super. 599, 612-13 (App. Div. 2003). "[F]raud is never presumed, but must be established by clear and convincing evidence." *Id.* at 613.

In addition to setting forth those necessary elements, claims for common law fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Under Rule 9(b), a "plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Id.* (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-224 (3d Cir. 2004). To meet this standard, a plaintiff "must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200.

Here, the Court finds that Plaintiffs have not stated a claim for fraud, because they have not sufficiently alleged that Defendant made a misrepresentation of fact. To that end, Plaintiffs contend that "Lyft's specific misrepresentation is contained within the TOS which states in Section 5[:] 'If you are a Driver, you will receive payment for your provision of Services. All Fare Payments are subject to a Lyft Commission, discussed below. ***You will also receive*** any tips provided by Riders to you, and tips will not be subject to any Lyft Commission.'" Pls.' Br. at 26 (quoting TOS at § 5) (emphasis in Pls.' Br). Because Plaintiffs interpret this language as providing that Lyft will calculate Driver payments based on the Fare charged to Riders, Plaintiffs contend that Lyft's failure to pay Drivers the Fare charged to Riders amounts to fraud. However, this Court has already rejected Plaintiffs' interpretation of § 5 as providing that Lyft must pay Drivers based on the Fare that Lyft charges its Riders for the same transaction. Accordingly, the cited portion of the TOS does not constitute a misrepresentation.

Moreover, although not raised by the parties, I also find that Plaintiffs' fraud claim is barred by the economic loss doctrine, because Count Three is devoid of any allegations separate from Plaintiffs' breach of contract claim. "The economic loss doctrine 'prohibits plaintiffs from

recovering in tort economic losses to which their entitlement only flows from a contract.'"

*Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 557, 562 (D.N.J. 2002)

(quoting *Duquesne Light Co. v. Westinghouse Elec. Co.*, 66 F.3d 604, 618 (3d Cir. 1995)).  In

that regard, "the economic loss doctrine 'defines the boundary between the overlapping theories

of tort law and contract law by barring the recovery of purely economic loss in tort . . . .'"

*Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 244 (3d Cir. 2010) (citation omitted).

"[W]hether a tort claim can be asserted alongside a breach of contract claim depends on whether

the tortious conduct is extrinsic to the contract between the parties."  *State Capital Title &*

*Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 676 (D.N.J. 2009); *Chen v. HD*

*Dimension, Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010).  "An alleged

misrepresentation is extraneous to an agreement when it breaches a duty 'separate and distinct

from the performance' of the agreement's terms."  *Montclair State Univ. v. Oracle USA, Inc.*, No.

11-2867, 2012 WL 3647427, at *5 (D.N.J. Aug. 23, 2012) (citation omitted).

For example, "a plaintiff may be permitted to proceed with tort claims sounding in fraud

in the inducement so long as the underlying allegations involve misrepresentations unrelated to

the performance of the contract, but rather precede the actual commencement of the agreement."

*State Capital Title*, 646 F. Supp. 2d at 676; *see Peters v. Countrywide Home Loans, Inc.*, No. 15-

6329, 2016 WL 2869059, at *4 (D.N.J. May 17, 2016) ("The economic loss doctrine 'does not

bar claims for fraud in the inducement of a contract,' because fraud in the inducement is fraud

that induces the other party to enter into the contract in the first place.") (quoting *Bracco*, 226 F.

Supp. 2d at 563-64); *Montclair State*, 2012 WL 3647427 at *4 ("Only those pre-contractual

misrepresentations that are extraneous to the parties' contract may be brought alongside a breach

of contract claim.").  Conversely, courts have applied the economic loss doctrine where the fraud

contemplated by the plaintiff is not extraneous to the contract, "'but rather on fraudulent performance of the contract itself.'" *Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 271 (D.N.J. 1985) (quoting *Foodtown v. Sigma Mktg. Sys., Inc.*, 518 F. Supp. 485, 490 (D.N.J. 1980)); *see*, *e.g.*, *Chen*, 2010 WL 4721514 at *9 (finding that the economic loss doctrine barred the plaintiff's fraud claim, where the complaint failed "to sufficiently allege a fraud separate and distinct from the performance of the Employment Agreement.").

Here, I find that the economic loss doctrine would bar Plaintiffs' fraud claim, as currently pled, because Count Three lacks any allegations that could be liberally construed as sufficiently alleging a fraud separate and distinct from Defendant's performance obligations under the TOS. In that regard, as currently pled, the alleged misrepresentation in this case is not extraneous to the parties' agreement; rather, Plaintiffs specifically point to the language of § 5 of the TOS as forming their claim for fraud.[13]  Accordingly, because this Court is unable to deduce any allegations of fraud from the FAC that are distinct from Defendant's performance obligations under the TOS, the Court finds that the economic loss doctrine applies, and Plaintiffs' fraud claim is dismissed.

---

[13] In their Opposition, Plaintiffs also argue that Defendant committed fraud by "<u>intentionally</u> conceal[ing] from [Plaintiffs] its true intention to not pay them the full fare charged the Rider by burying their purported authority for the same within a 'Commission Schedule,' whose existence could not be found until mid-October 2017, and then only after a convoluted six step navigation through the web sphere." Pls.' Br. at 27 (emphasis in original).  However, Plaintiffs' fraud claim, as pled in the FAC, contains no such allegation.  Accordingly, because it is "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted), this Court will not consider Plaintiffs' argument that Lyft's failure to provide access to the Commission Schedule constitutes fraud on this Motion. *See Bell v. City of Philadelphia*, 275 Fed. Appx. 157, 160 (3d Cir. 2008) (observing that "a plaintiff 'may not amend his complaint through arguments in his brief in opposition . . . .'").  To the extent Plaintiffs seek to allege that their fraud claims arise from fraud in the inducement, Plaintiffs may amend the FAC to assert such a claim.

### 4.    *Unjust Enrichment*

Plaintiffs' final cause of action is for unjust enrichment, pled as an alternative claim.  *See* FAC at 48.  Specifically, Plaintiffs incorporate the allegations that comprise the rest of the FAC and allege that Lyft has been unjustly enriched by "retain[ing] a larger portion of the passenger fare than they promised they would retain *in the TOS*."  FAC at 48 (emphasis added).

"The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another."  *Assocs. Commercial Corp. v. Wallia*, 211 N.J. Super. 231, 243 (App. Div. 1986).  "To establish a claim for unjust enrichment, 'a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'"  *Iliadis v. Wal-Mart Stores, Inc.*, 191 N.J. 88, 110 (2007) (quoting *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994)).  "Unjust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability."  *Goldsmith v. Camden Cty. Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009) (citation and internal quotation marks omitted).  "Because unjust enrichment is an equitable remedy resorted to only when there was no express contract providing for remuneration, a plaintiff may recover on one or the other theory, but not both."  *Caputo v. Nice-Pak Prod., Inc.*, 300 N.J. Super. 498, 507 (App. Div. 1997); *see Amgro, Inc. v. Lincoln Gen. Ins. Co.*, 361 F. App'x 338, 346 (3d Cir. 2010) (affirming summary judgment of the plaintiff's unjust enrichment claim, where an express contract governed the parties' relationship); *Simonson v. Hertz Corp.*, No. 10-1585, 2011 WL 1205584, at *6 (D.N.J. Mar. 28, 2011) ("[A] plaintiff may not recover on both a breach of contract claim and an unjust enrichment claim . . . .").  Nonetheless, because, at the motion to dismiss stage, parties may plead alternative and inconsistent legal causes of action arising out of the same facts, *see* Fed. R. Civ. P. 8(d)(2)-(3), courts allow parties to bring claims

for breach of contract and unjust enrichment in the alternative. *See Simonson*, 2011 WL 1205584 at *6.

Here, Plaintiffs have failed to sufficiently allege a claim for unjust enrichment, because Plaintiffs' claim for unjust enrichment rests entirely on the terms of the parties' agreement. To that end, the FAC alleges that "Lyft has been unjustly enriched and has received and retained payments from Lyft Riders beyond those promised *in Defendant's agreement with its Lyft Drivers.*" FAC at 48 (emphasis added). As the Court has already noted, a party cannot state a claim for unjust enrichment where a contract expressly covers the dispute between the parties. *See Amgro*, 361 F. App'x at 346; *Caputo*, 300 N.J. Super. at 507; *Simonson*, 2011 WL 1205584 at *6. Thus, although parties can plead unjust enrichment as an alternative claim where there is a question as to the enforceability of a contract, or to whether that contract governs the parties' dispute, here, because Plaintiffs' unjust enrichment claim, as currently pled, is based entirely on the terms of the parties' agreement, the Court cannot find that Plaintiffs have stated a claim for unjust enrichment. Accordingly, Plaintiffs' claim for unjust enrichment is dismissed without prejudice.

In sum, the Court dismisses the FAC without prejudice for failure to state a claim upon which relief can be granted.[14] Nonetheless, because the Court is satisfied that amendment may not be futile, the Court will grant Plaintiffs leave to file an amended complaint within thirty (30) days of the date hereof.

## V.  **CONCLUSION**

---

[14] Because the Court finds that dismissal of the FAC, in its entirety, is warranted, I need not address Plaintiffs' request for injunctive relief.

For the foregoing reasons, Defendant's Motion to Dismiss the FAC for failure to state a claim is granted, and the FAC is dismissed without prejudice. Plaintiffs' Cross-Motion to Amend is thus denied, because the FAC fails to state a claim. Nonetheless, the Court separately grants Plaintiffs leave to file an amended complaint, consistent with this Opinion, within thirty (30) days of the date hereof.

Dated: May 31, 2018                                        /s/ Freda L. Wolfson
                                                           Hon. Freda L. Wolfson
                                                           United States District Judge